UNITED STATES, Appellee

v.

Cathleen L. MURPHY, Staff Sergeant
U.S. Air Force, Appellant.

No. 63,837.
CMR No. 27422.

U.S. Court of Military Appeals.

Argued Feb. 1, 1994.

Decided July 20, 1994.

For Appellant: *Captain Robert A. Parks* (argued); *Colonel Jay L. Cohen* (on brief); *Lieutenant Colonel Frank J. Spinner.*

For Appellee: *Lieutenant Colonel Thomas E. Schlegel* (argued); *Colonel Jeffery Infelise* (on brief); *Major Barnard N. Madsen.*

*Opinion of the Court*

CRAWFORD, Judge:

Contrary to her pleas, appellant was convicted of wrongful use of cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The convening authority approved the sentence of a bad-conduct discharge, 2 years' confinement, and reduction to the lowest enlisted grade. After the case was heard twice by the Court of Military Review [29 MJ 573 (1989) and 36 MJ 732 (1992)] and once by this Court [33 MJ 323 (1991)], the findings and sentence were affirmed. We specified the following issue for review:

> WHETHER THE [UNLAWFUL] QUESTIONING OF APPELLANT WITHOUT THE REQUIRED [ARTICLE 31] WARNING PRECLUDED ADMISSIBILITY OF THE [CONSENSUAL] URINALYSIS RESULTS.

For the reasons stated herein, we hold that the results of appellant's urinalysis were properly admitted into evidence.

FACTS

At the time of trial, appellant was a 30-year–old staff sergeant, on active duty for

over 10 years, and all of which was in the security police field, including search and seizure. She was a senior security police supervisor performing duties as a flight chief with responsibilities for training other security police officers. A high school graduate, appellant also took college level courses in law enforcement procedures.

On August 17, 1987, an Air Force Office of Special Investigations (OSI) agent told the security police superintendent, Senior Master Sergeant Spahr, that an informant had seen appellant at the Fast and Cool Club on the previous Saturday night using illegal drugs and in the company of a civilian woman named Tonya or Tina.

The OSI requested that appellant's commander, Captain Thomas, ask her three questions about the incident reported by the informant. Captain Thomas called appellant at home and left a message on her answering machine requesting her to call his office. She returned his call on August 19, 1987, and arranged to meet with Captain Thomas after drawing her weapon and before reporting for duty on the afternoon of August 20, 1987.

That afternoon she reported to Captain Thomas. Her supervisor, Sergeant Holiman, was also present. Without warning appellant pursuant to Article 31(b), UCMJ, 10 USC § 831, Captain Thomas informed her that he was going to ask her some questions regarding her whereabouts on the previous Saturday night. Captain Thomas first asked appellant where she was on Saturday night, and she said at the Fast and Cool Club. He then asked who she was with, and she said Tonya or Tina. Third, he asked who Tonya or Tina was, and she said a civilian female whom she had met.

After she answered the three questions, Captain Thomas told her there was an allegation she had used drugs, and he asked if she was "willing" to give a urine sample. She replied, "Yes." Because she was familiar with the consent-to-search form, she did not hesitate filling that out. Appellant completed and signed a consent to search form that contained the following:

I know that I have an absolute right to give my consent to a search. I understand that, if I do consent to a search, anything found in the search can be used against me in a criminal trial.... I also understand that, if I do not consent, a search cannot be made without a warrant or other authorization recognized in law.

Captain Thomas testified that there were "several [similar] allegations made daily" in this "particular field," thus he did not warn her until he found "some validity" to the allegations. Captain Thomas denied telling appellant, "If you do not consent to it, you will be given a command-directed urinalysis test." Captain Thomas also testified that she "was free" to "leave" the office.

We previously held that Captain Thomas was required to give Article 31 warnings prior to asking the three questions. 33 MJ at 329. The question we must now address is whether the consent to search was a fruit of the poisonous tree.

## DISCUSSION

The term "fruit of the poisonous tree" doctrine was first used in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). In *Nardone*, the Court indicated that it is not enough to show "a causal connection" between the original evidence and the derivative evidence because "[a]s a matter of good sense ... such connection may have become so attenuated as to dissipate the taint." *Id.* at 341, 60 S.Ct. at 268. *See also* Mil.R.Evid. 304(e)(3), 311(a) and (e)(3), Manual for Courts–Martial, United States, 1984. The doctrine was further refined in *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963), where the Supreme Court stated:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light *but for* the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by

means sufficiently distinguishable to be purged of the primary taint."

(Emphasis added.)

■ In *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985), the Court stated: "The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession." Since the standard as to consent is whether it was voluntary, we shall examine the analysis of *Elstad. Cf. United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1047–49 (9th Cir. 1990); *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1515–19 (6th Cir.1988). In *Elstad* the Supreme Court declined to exclude an otherwise voluntary statement following an inadmissible statement obtained by the police. As the Court stated:

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 314, 105 S.Ct. 1296.

As in *Elstad,* the crucial issue here is not whether the consent was a fruit of the inadmissible statement but rather, in *Elstad*'s terms, whether the "later confession" was voluntary. The Court rejected the state court view "that the unwarned remark compromised the voluntariness of [Elstad's] later confession." *Id.* at 309, 105 S.Ct. at 1293.

The Court has refused to apply a "but for" test and has also rejected the theory that the second confession would be inadmissible under a "cat-out-of-the-bag" theory. *Id.* at 311, 105 S.Ct. at 1294. The Court went on to

indicate that any psychological compulsion that may flow from the unwarned statement was too speculative and attenuated in terms of its impact:

This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver.

The Oregon court, by adopting this expansive view of Fifth Amendment compulsion, effectively immunizes a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent....

There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case. Justice Brennan's contention that it is impossible to perceive any causal distinction between this case and one involving a confession that is coerced by torture is wholly unpersuasive. Certainly, in respondent's case, the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best.

*Id.* at 312–14, 105 S.Ct. at 1294–96. *See also United States v. Gonzalez–Sandoval,* 894 F.2d at 1047–49; *United States v. Sangineto–Miranda,* 859 F.2d at 1515–19.

Next, we shall apply the *Elstad* analysis to the question of the voluntariness of appellant's consent. It is not necessary for us to draw a distinction between a statement made by an accused and physical evidence, although we note that some courts have done so.* The legal standard as to the existence

---

* As the Supreme Court of North Carolina has stated:

We do not see how the trustworthiness of the physical evidence admitted in this case could be affected by its admission or exclusion. Although the officers in this case violated the prophylactic rule of *Miranda* as extended by *Edwards* [*v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)], they did not

of consent is as follows: "Thus, while always viewing the facts in the light most favorable to the Government ... this Court has appropriately concerned itself with whether those facts in any given case support the conclusion of consent." *United States v. Middleton*, 10 MJ 123, 133 (CMA 1981).

██ Mil.R.Evid. 314(e)(4) and (5) provide that consent must be voluntary and must be shown by "clear and convincing evidence." In determining whether consent is voluntary, the Court should examine the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). *See United States v. Goudy*, 32 MJ 88, 90 (CMA 1991). Applying this test, there are several factors that establish the voluntariness of appellant's consent: She is an experienced law enforcement officer; she is knowledgeable about and filled out the consent form without assistance; she was allowed to set the time for

the meeting with Capt. Thomas; she was free to leave the meeting; she was not frightened or confused; she was not evasive or uncooperative; she is 30 years old; she has some college education; and there were no threats or orders. *See United States v. McClain*, 31 MJ 130, 133 (CMA 1990); *United States v. White*, 27 MJ 264, 266 (CMA 1988); *United States v. Middleton*, 10 MJ at 132. *Cf. United States v. Sager*, 36 MJ 137, 143 (CMA 1992).

We hold that there was "clear and convincing evidence" of voluntary consent by this appellant.

The decision of the United States Air Force Court of Military Review on further review is affirmed.

Chief Judge SULLIVAN and Judges COX, GIERKE, and WISS concur.

---

violate the defendant's constitutional right not to incriminate himself. It is important that all relevant evidence be submitted to the jury in order for it to make the proper findings. This outweighs the need to exclude evidence which was gathered as the result of a non-coercive statement made in violation of the prophylactic rule....

*State v. May*, 334 N.C. 609, 434 S.E.2d 180, 182 (NC 1993). *See also New York v. Quarles*, 467 U.S. 649, 661–71, 104 S.Ct. 2626, 2634–40, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring and dissenting).