Chief Judge GIERKE
delivered the opinion of the Court.
Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the “fruit of the poisonous tree” and is generally not admissible at trial.[1] In this case we address the question of whether consent to a subsequent search is the antidote to the poison created by an earlier unlawful search.[2] Although the subsequent consent may be a good treatment for the poison, it is not a panacea. Here, we hold that Appellant’s consent did not purge the taint of the earlier unlawful search.
We granted review of two issues presented by Appellant.[3] Because of our resolution of Issue I (unlawful search and seizure), it is unnecessary to address Issue II (the legal sufficiency of evidence).
Appellant was a nineteen-year-old Airman First Class who was assigned as a student at Keesler Air Force Base, Mississippi. He was a trainee whose room was subject to routine, random inspections by the Military Training Leaders (MTLs) assigned as supervisors of the students. On April 26, 2001, Staff Sergeant (SSgt) Roy, an MTL, was conducting inspections. SSgt Roy testified that, as a “Phase IV” trainee, Appellant was subject only to inspections designed to ensure that his room was neat and orderly and maintained in compliance with regulations.[4] In conducting the “neat and orderly inspection” of Appellant’s room, she inadvertently disturbed the keyboard of Appellant’s personal computer causing the monitor to activate. The “wallpaper” that was then displayed on the computer screen contained a photograph of an actress wearing a fishnet top through which her breasts were visible. A Keesler Air Force Base Instruction[5] prohibited the “open display of pictures, statues, or posters which display the nude or partially *335 nude human body.” SSgt Roy testified that such a picture could result in a minor “write up” for violating the base regulation.
Not sure what she should do, SSgt Roy contacted a senior noncommissioned officer, Technical Sergeant (TSgt) Schlegel. TSgt Schlegel had previously been involved in an inspection where he found child pornography on a computer. TSgt Schlegel testified that he had consulted with the Air Force Office of Special Investigations (AFOSI) and had been informed that it was “legal according to [the] Military Rules of Evidence” for him to examine files on a computer if he found pornography openly displayed on the computer. Following that previous guidance, TSgt Schlegel went to Appellant’s room and opened and examined other files in his computer. In so doing, he found files on the hard drive showing nude pictures of females that TSgt Schle-gel estimated to be between fifteen and nineteen years of age. Eventually he found a folder labeled “pom.” Opening that folder, he found another folder called “Teen” that contained files of nude young females.
TSgt Schlegel and SSgt Roy then reported the results of their efforts to their commander who told them to contact the AFOSI. After being briefed by the MTLs, two AFO-SI agents located Appellant at the dining facility, identified themselves to him, and asked for his consent to search his room and his computer for child pornography. Appellant gave his consent and, not surprisingly, the agents located the various images discovered earlier in the day by TSgt Schlegel. In a subsequent interview with the AFOSI agents, Appellant explained that he had copied several discs which he had received from another airman. Most of the images on the discs were of adults, but some did appear to be of girls between the ages of thirteen and seventeen. He stated that he intended to delete those images, but had failed to do so.
At trial, Appellant moved to suppress the images discovered and his statements to the AFOSI agents. He argued that SSgt Roy and TSgt Schlegel went beyond the bounds of an inspection and that the actions of TSgt Schlegel were actually a subterfuge for a search. The military judge denied the motion holding that the unique training environment at Keesler Air Force Base justified more intrusive “inspections” than would be allowable in a non-training environment.
Appellant was subsequently convicted, contrary to his pleas, of possession of child pornography in violation of the Child Pornography Prevention Act of 1996 (CPPA).[6] He was sentenced to a bad-conduct discharge, reduction to the lowest enlisted paygrade, and confinement for six months.[7]
In its review of the case pursuant to Article 66, Uniform Code of Military Justice (UCMJ),[8] the Air Force Court of Criminal Appeals disagreed with the military judge’s conclusion that the activities of the MTLS were legitimate military inspections.[9] The court below found that, although the observance of the partially nude image on the “wallpaper” was the result of a proper inspection, the subsequent examination of files located on Appellant’s hard drive went beyond the scope of the inspection and became a search into an area where Appellant had a reasonable expectation of privacy.[10] Nevertheless, the Court of Criminal Appeals determined that Appellant’s subsequent consent to the search by the AFOSI agents waived his privacy interest and legitimized the subsequent search and seizure of the computer by those agents.[11]
The case now comes to us for review. We agree with the court below that the originally lawful and proper inspection became an un *336 lawful search when TSgt Schlegel began examining files on the computer that were not in plain view. We next consider whether the subsequent consent overcame the taint of the previously unlawful Government conduct. Here, we part company with the lower court and hold that subsequent consent to search is just one of the factors that goes into the analysis. As we examine all the relevant factors and the circumstances surrounding the law enforcement activity in this case, we conclude that the taint of the unlawful inspection is not sufficiently attenuated by Appellant’s subsequent consent to search provided to the AFOSI agents.
I. The Inspection
The initial entry into Appellant’s room by SSgt Roy was a valid military inspection conducted in accordance with the applicable base regulations and the Military Rules of Evidence (M.R.E.). The base inspection program was comprehensive and reasonably directed at ensuring unit fitness and proper standards.[12] The image of the scantily clad female on Appellant’s “wallpaper” was in plain view when discovered by the inspector. At this point it would have been appropriate for the inspector to secure the computer as evidence[13] of an apparent violation of the base regulation prohibiting the display of the “nude or partially nude human body.”[14]
It was certainly appropriate for SSgt Roy to contact a senior, more experienced MTL for advice on how best to proceed after her discovery of the image. However, we agree with the Air Force Court of Criminal Appeals that the actions of the more experienced MTL exceeded the authorized scope and purpose of the proper inspection.[15]
SSgt Roy was acting pursuant to applicable base regulations that required the inspection of dormitory rooms at least once a week to “ensure standards of cleanliness, order, decor, safety and security are maintained”[16] when she inadvertently activated Appellant’s computer and noticed the wallpaper that appeared on the screen. The regulations deal with the “plain view” situation by requiring that unauthorized items, including unauthorized pornography, “be confiscated [and] brought to the attention of the Chief MTL/ MTF [Military Training Facility] Commander.”[17] The image of the partially nude woman that SSgt Roy observed was “in plain view.”[18] Her decision to report her discovery up the chain of command was fully in accordance with the inspection regime.
TSgt Schlegel determined, based on his discussions with AFOSI in a similar situation, that it was proper to open the files on the computer that was left on and that was not protected by a password. In that similar situation, TSgt Schlegel concluded that he should treat the contents of a computer as if they were in a desk drawer and he felt free to open the files on the computer.
The desk drawer analogy is troublesome for two reasons. First, the inspection is a “neat and orderly” inspection designed to ensure standards of cleanliness, order, decor, safety and security. Opening desk drawers could be appropriate under such an inspection scheme to ensure, for example, that hazardous or unsanitary materials were not being improperly stored. It is difficult to understand, however, how opening files on a computer could serve a similar “neat and orderly” purpose. Second, even if the drawer analogy was appropriate, the regulation discusses how drawers are to be inspected. It states:
When inspecting drawers (dresser, nightstand, desk, etc.), MTLs will check for clutter. If there is a non-transparent plas *337 tic container in a drawer or anywhere in the dorm room with small items within, it will not be opened and searched unless the owner is present. If the container is transparent and unauthorized items can be observed by sight, the container is inspeetable, i.e., if a wall locker key is observed in a transparent container, a security violation has occurred.[19]
If we assume that the computer is to be treated as a drawer, we must then decide how a file on the computer is to be treated. The contents of the file are not viewable without opening the file. Indeed, the existence of the file is not viewable without taking several steps beyond the “wallpaper” that was in plain view. Accordingly, we conclude that, even if the drawer analogy was appropriate, the files on the computer should have been treated as the contents of a non-transparent container. Taking the drawer analogy to its logical result leads us to the conclusion that TSgt Schlegel’s actions in opening the files went beyond what was authorized for non-transparent containers.
The fact that the inspection exceeded its authorized purpose and scope would not be determinative if Appellant had no reasonable expectation of privacy in the files on his personal computer located in his dormitory room. In dealing with the computer privacy question, we have held that a servicemember has an expectation of privacy in the contents of a personal computer in his or her home.[20] On the other hand, we have concluded that there is a more limited expectation of privacy in a government computer located in a government office environment.[21] We have not addressed the privacy interests involved on these precise facts: a personally owned computer located on base in a dormitory room that was shared with another individual. Although we have recognized a privacy interest in assigned military dwellings,[22] we have held that “the threshold of a barracks/dormitory room does not provide the same sanctuary as the threshold of a private home.”[23]
Justice Harlan, in his concurring opinion in Katz v. United States,[24] articulated what has become the test used in evaluating the question of a reasonable expectation of privacy. He concluded that there “is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as ‘reasonable.’ ”[25]
In applying that standard to this case, we conclude that Appellant did have a subjective expectation of privacy in the files stored on the hard drive of his computer and that military society would recognize such an expectation as reasonable. We therefore agree with the Court of Criminal Appeals that an individual sharing a two-person dormitory room has a reasonable expectation of privacy in the files kept on a personally owned computer.[26] We next turn to that court’s conclusion that, despite the unlawful inspection, the evidence seized by the AFOSI agents was *338 admissible as the result of Appellant’s voluntary consent to the search of his room and computer.[27]
II. The Consent Search and Attenuation of Taint
After TSgt Schlegel completed his unauthorized search of Appellant’s computer and its files, the MTLs contacted their commander who told them to inform the AFOSI. After talking with the MTLs, two AFOSI agents and SSgt Wilcox, a third MTL present during the inspection, found Appellant at the dining hall.[28] Without telling him of the results of TSgt Schlegel’s examination of his computer, they requested his permission to search his room and his computer. He granted consent and signed a form to that effect. Based on this consent, the Court of Criminal Appeals held that:
Once the appellant gave his consent to search his room and his computer, he waived any reasonable expectation of privacy he might have enjoyed. Thus, although we reach our conclusion by a different route than the military judge, we agree that the appellant was not entitled to have the evidence suppressed.[29]
Therefore, the question for this Court is whether Appellant’s consent to search cured the earlier violation. The granting of consent to search may sufficiently attenuate the taint of a prior violation. For example, we have held that the voluntary consent to a urinalysis was not tainted by an earlier, unwarned interrogation.[30] On the other hand, the granting of consent to search does not cure all ills. “If appellant’s consent, albeit voluntary, is determined to have been obtained through exploitation of the illegal entry, it can not be said to be sufficiently attenuated from the taint of that entry.”[31]
The voluntariness of Appellant’s consent is not at issue. The only question facing us is whether Appellant’s consent was an independent act of free will. In Brown v. Illinois[32] the Supreme Court analyzed three factors to determine if Miranda[33] warnings were sufficient to remove the taint of an unlawful search and allow the admission of a subsequent confession. The Court held that the question of whether such a confession is an act of free will must be answered on the facts of each case looking at the temporal proximity of the unlawful police activity and the subsequent confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.[34] In Khamsouk>[35] we were unanimous in adopting the Brown three-pronged approach in examining the effects of an unlawful arrest upon a subsequent search, although our application of that approach was less than unanimous.[36]
The Fifth Circuit, in a case almost identical to the case we face, followed the Brown test. “To determine whether the defendant’s consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation, we must consider three factors: (1) the temporal proximity of the illegal conduct and the *339 consent; (2) the presence of intervening circumstances; and (3) the purpose and the flagraney of the initial misconduct.”[37]
Applying this three-prong test to the facts at hand, we determine that all three favor Appellant. First, in terms of the temporal proximity of the illegal conduct and the consent, less than three hours elapsed between the time that TSgt Schlegel began opening files on Appellant’s computer and the time that Appellant consented to the search. Indeed, it appears that everything happened on a single day before lunch.
Second, there were no intervening circumstances sufficient to remove the taint from the initial illegal search. Yes, different agents were involved, but they were fully briefed by the MTLs who conducted the inspeetion/search. Additionally, one of the MTLs involved in the initial visit to Appellant’s room accompanied the AFOSI agents in their search for Appellant. Simply stated, the AFOSI agents would not have been interested in talking to Appellant but for the information relayed to them as a direct result of the unlawful search that had just taken place. There were no intervening events or circumstances that would sever the causal connection between the two searches.
Turning to the third factor in our analysis of the independent nature of the two searches, we examine the Government’s conduct. Although we find no bad motive or intent on behalf of the Government agents in this case, we do find that their actions were unnecessary and unwise. TSgt Schlegel chose to expand the scope of a legitimate inspection into private files stored on a personal computer. There were a variety of legitimate options open to him. He might have secured the room and the computer and charged Appellant for the open display of the nude image. He might have presented the facts to his commander and sought search authorization or other guidance. He might have asked the advice of a staff judge advocate.
Although we are hesitant to call TSgt Schlegel’s actions “flagrant,” they were certainly unwise, avoidable, and unlawful.[38] The actions of the AFOSI agents exploited the original illegality. Upon being informed of the material found on Appellant’s computer, they did nothing in the way of independent investigation. Instead, they immediately sought out Appellant. Finding him in the on-base dining facility at the noon meal, they escorted him outside and requested his consent to search.
In applying the Brown factors to the facts of this case, we return to the Fifth Circuit’s analysis. In Hernandez, a police officer felt the bag of a passenger who had boarded a bus, while the bag was in the luggage compartment underneath the bus.[39] Feeling something suspicious, he then boarded the bus and asked the passenger for permission to search the bag.[40] She gave consent, and he opened the bag discovering drugs inside.[41] The Fifth Circuit noted that the first two factors of the Brown test weighed in favor of the defendant, because the consent was obtained immediately following the illegal manipulation of the bag and there were no intervening circumstances.[42] It concluded that the officer’s conduct in manipulating the bag was not flagrant, noting that it might not have been considered a search under Fifth Circuit precedent at the time of the officer’s action, but it concluded that the drugs seized were inadmissible because “the causal connection between the violation and the consent was not broken.”[43]
*340 We are confronted with a very similar situation here, and like the Fifth Circuit, we conclude that there was a causal connection between the illegal search and the act of obtaining consent. The illegal search is the only factor that led directly to the request for consent from Appellant and the subsequent search of his computer. The exploitation of the information obtained from the illegal search was flagrant even if the search itself was not. Since Appellant’s consent was “obtained through exploitation of the illegal [search], it can not be said to be sufficiently attenuated from the taint of that [search].”[44] Appellant’s consent was not “an independent act of free will”[45] sufficient to cure the poisonous effects of the unlawful search.
III. The Exclusionary Rule
The fundamental purpose of the exclusionary rule is to deter improper law enforcement conduct. Were we to hold that Appellant’s consent to search requested by agents as a direct result of, and almost immediately after, an unlawful search was sufficient to dissipate the taint of the unlawful conduct, we might well be encouraging unlawful conduct rather than deterring it. We have not discovered, nor has the Government argued, any exception to the exclusionary rule that applies to the facts of this case. Accordingly, we conclude that the military judge erred in not granting Appellant’s motion to suppress.
The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings of guilty and sentence are set aside. The record is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (defining the question as whether the derivative evidence, " ‘has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' ” (quoting John MacArthur Maguire, Evidence of Guilt 221 (1959))).

. This Court granted review of the following issues:
I. WHETHER THE MILITARY JUDGE ERRED IN ADMITTING EVIDENCE AT TRIAL THAT WAS OBTAINED AS A DIRECT RESULT OF AN ILLEGAL SEARCH OF APPELLANT’S PERSONAL COMPUTER.
II. WHETHER THE EVIDENCE PRESENTED BY THE PROSECUTION AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT APPELLANT’S CONVICTION FOR POSSESSING CHILD PORNOGRAPHY.

. See Air Education and Training Command, Instr. 36-2216, Technical Training Administration of Military Standards and Discipline Training Table A2.2.14 (May 2, 2000).

. Keesler Air Force Base Instr. 32-6003, Dormitory Security and Living Standards for Non-Prior Service Airmen 4.2.3 (Aug. 30, 2003) [hereinafter KAFBI 32-6003],

. 18 U.S.C. § 2252A (2000).

. The convening authority remitted the punitive discharge pursuant to a decision of the Air Force Clemency and Parole Board.

. 10 U.S.C. § 866 (2000).

. United States v. Conklin, No. ACM J5217, 2004 CCA LEXIS 290, at *13-*15, 2005 WL 11587, at *3-*6 (A.F.Ct.Crim.App. Dec. 30, 2004) (unpublished).

. 2004 CCA LEXIS 290, at *15, 2005 WL 11587, at *5.

. 2004 CCA LEXIS 290, at *15-*16, 2005 WL 11587, at *5.

. See M.R.E. 313(b).

. Id. ("Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.”).

. KAFBI 32-6003 para. 4.2.3.

. Conklin, 2004 CCA LEXIS 290, at *15, 2005 WL 11587, at *5.

. Dep’t of the Air Force, 81 TRG Pamphlet 36-2201, Military Training, at 9 (July 5, 1999) [hereinafter 81 TRG Pamphlet 36-2201].

. Id.

. M.R.E. 316(d)(4)(C).

. 81 TRG Pamphlet 36-2201, at 10.

. United States v. Maxwell, 45 M.J. 406, 418 (C.A.A.F.1996).

. United States v. Tanksley, 54 M.J. 169, 172 (C.A.A.F 2000), overruled in part on other grounds by United States v. Inong, 58 M.J. 460, 465 (C.A.A.F.2003).

. United States v. Middleton, 10 M.J. 123, 132 (C.M.A.1981) (a locked wall locker is in a zone of privacy protected by the Fourth Amendment).

. United States v. McCarthy, 38 M.J. 398, 403 (C.M.A.1993) (barracks room does not afford the same protections from arrest as a private home).

. 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

. Id. at 361, 88 S.Ct. 507; see also United States v. Monroe, 52 M.J. 326, 330 (C.A.A.F.2000) (citing Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990)).

. Conklin, 2004 CCA LEXIS 290, at *12, 2005 WL 1157 at *4. We note that the base regulations which are the basis for the inspections in this case are silent about personal computers. Accordingly, we voice no opinion today regarding a situation where regulations dealing with personal computers, barracks use, and privacy interests might exist.

. Conklin, 2004 CCA LEXIS 290, at *16, 2005 WL 1157 at *5.

. The timing of events is not clear from the record. The AFOSI agent testified that he recalled being contacted between 0900 and 0930. That is contradicted by TSgt Schlegel’s testimony in which he recalled getting involved between 1045 and 1050. Appellant executed the consent to search form at 1230. Accordingly, it is apparent that something less than three hours elapsed from the time of the inspection to the time that Appellant was contacted by AFOSI.

. Conklin, 2004 CCA LEXIS 290, at *16-* 17, 2005 WL 11587, at *5.

. United States v. Murphy, 39 M.J. 486, 489 (C.M.A.1994).

. United States v. Khamsouk, 57 M.J. 282, 290 (C.A.A.F.2002).

. 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Brown, 422 U.S. at 603-04, 95 S.Ct. 2254.

. Khamsouk, 57 M.J. at 282.

. Indeed, the Khamsouk opinion resulted in something exceptionally unusual in this Court's jurisprudence—five separate opinions. Id. at 283-307.

. United States v. Hernandez, 279 F.3d 302, 307 (5th Cir.2002).

. In evaluating the nature of the senior MTL’s conduct in this case, we are mindful of the fact that his inspection of a personal computer on a different occasion has been the subject of appellate criticism. See United States v. Astley-Teixera, No. ACM 35161, 2003 CCA LEXIS 246, at *27, 2003 WL 22495794, at *10 (A.F.Ct.Crim.App. Oct. 21, 2003) (a different panel of the Air Force Court facing facts virtually identical to those presented here, found the inspection unlawful and reversed).

. 279 F.3d at 305.

. Id.

. Id.

. Id. at 308-09.

. Id. at 309.

. Khamsouk, 57 M.J. at 290.

. Hernandez, 279 F.3d at 307.